MATTHEW T. SINNOTT (SBN 229468)
msinnott@martensonlaw.com
DAVID L. LEWIS (SBN 284537)
dlewis@martensonlaw.com
MARTENSON, HASBROUCK & SIMON LLP
5800 Armada Drive, Suite 101
Carlsbad, California 92008
Telephone:   (760) 683-8499
Facsimile:    (404) 909-8120

Attorneys For Plaintiff
UNIVERSAL BUILDING MAINTENANCE, LLC DBA ALLIED UNIVERSAL
JANITORIAL SERVICES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNIVERSAL BUILDING MAINTENANCE, LLC dba ALLIED UNIVERSAL JANITORIAL SERVICES,<br><br>            Plaintiff,<br><br>      v.<br><br>JOSEPH CALCOTE,<br><br>            Defendant. | CASE NO.: 8:22-cv-01125<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |

## COMPLAINT

Plaintiff Universal Building Maintenance, LLC d/b/a Allied Universal Janitorial Services ("Allied Universal"), by and through its undersigned counsel, hereby sets forth this Complaint for Damages and Injunctive Relief against Defendant Joseph Calcote ("Calcote" or "Defendant"), respectfully showing this Court as follows:

## INTRODUCTION

This action is brought to halt an ongoing, unlawful scheme by a former high-level employee who has exploited a position of trust for personal gain. In brazen violation of his contractual, common law, and statutory obligations, Defendant has engaged in a campaign to steal trade secrets and other confidential information from Allied Universal. Specifically, Allied Universal has discovered that, *while still employed by Allied Universal*, Defendant emailed numerous files containing confidential and proprietary information stored on his Allied Universal computer and on the company's intranet to his personal email account. He subsequently accepted employment with one of Allied Universal's competitors and attempted to use these trade secrets to Allied Universal's detriment. Defendant has violated—and, absent judicial intervention, will continue to violate—his legal obligations to Allied Universal. This suit is, regrettably, necessary to avoid immediate and irreparable harm to Allied Universal, pending an adjudication of the merits of this case and a hearing on Allied Universal's application for a permanent injunction.

## PARTIES

1.      Allied Universal is a Delaware limited liability company with its principal places of business in Santa Ana, California and Conshohocken, Pennsylvania.

2.      Joseph Calcote ("Calcote") is an individual resident of the State of California. He can be served at his home address of 5453 Shenandoah Ave, Los Angeles, California 90056.

4855-8639-0564, V. 1

**JURISDICTION AND VENUE**

3.      The Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331 because Allied Universal's claim against Defendant under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., raises a federal question. Allied Universal's remaining claims fall within this Court's supplemental jurisdiction (28 U.S.C. § 1367) because they are so related to the federal claim that they form part of the same case or controversy.

4.      Calcote is subject to the jurisdiction of this Court because he is a resident of the State of California.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**FACTUAL BACKGROUND**

**Allied Universal's Business Operations.**

6.      Allied Universal provides contract janitorial and maintenance services to client sites throughout the United States, including high-rise office buildings, banks, apartment complexes, government buildings, doctor's offices, spas, churches, and office parks.

7.      Allied Universal has developed customized business plans for janitorial solutions that are the primary key to its growth and success. Every customer has different janitorial needs according to its business, user demographics, and requests of the owners and operators. Allied Universal has researched and invested in technology and strategically implements the tools that are best suited to each individual customer. It works with each customer to design custom and cost-effective janitorial solutions to fit their needs.

8.      Allied Universal has developed and maintained confidential and proprietary marketing plans and strategies, pricing platforms and fee structures, bid information, and confidential contact information for all Allied Universal's prospective customers.

///

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4855-8639-0564, V. 1

**Calcote Was Trusted with Confidential and Proprietary Information.**

9.      In or around December 2018, Allied Universal hired Calcote as the Business Development Manager for the northern Los Angeles, California region.

10.      As the Business Development Manager, Calcote was integral to Allied Universal's business operations. He was responsible for expanding and developing Allied Universal's business portfolio in the northern Los Angeles region.

11.      On December 7, 2018, Calcote executed a "Confidentiality and Non-Solicitation Agreement," (hereinafter, "Agreement") attached hereto as **Exhibit A**, wherein he agreed in relevant part, *inter alia*, to the following:

> **No Disclosure**. I agree that at all times, both during and after the time when I am providing services to the Company, I must maintain the confidentiality of Confidential Information. That is, unless I have received prior express written consent from the Company's CEO in each instance, I will not summarize, disclose, reverse engineer, or otherwise communicate any Confidential Information to any person or entity, whether directly or indirectly, except to the limited extent actually necessary to perform services for the Company…
>
> . . .
>
> **Return of Confidential Information**. If the Company provides me with any Confidential Information in a tangible form, I agree to return all such materials (including originals and copies thereof) immediately to the Company upon request. I recognize that the unauthorized taking of any Confidential Information may be a crime under section 499c of the California Penal Code and may also result in civil liability under sections 3426.1 through 3426.11 of the California Civil Code and section 2860 of the California Labor Code.
>
> . . .
>
> **Ownership Rights**. I hereby acknowledge and agree that all original works of authorship that are made by me (in whole or in part, either along or jointly with others) during the period that I am performing services for the Company are protectable by copyright ("Works") shall be deemed "works made for hire" for the Company within the meaning of the copyright laws of the United States and the Company shall be deemed to be the sole author thereof in all territories and for all purposes…
>
> . . .

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4855-8639-0564, V. 1

**No Solicitation**. I further agree that while I am providing services to the Company, and for a period of two (2) years after I stop providing services to the Company for any reason, I will not use any Confidential Information to solicit or attempt to solicit, on behalf of any person or entity other than the Company, business from any Company Client I serviced, directly or indirectly, as a result of my employment with the Company. I further agree that while I am providing services to the Company, and for a period of two (2) years after I stop providing services to the Company for any reason, I will not solicit or attempt to solicit for employment, on behalf of any person or entity other than the Company, any Company employee or any employee employed by the Company six (6) months prior to the end of Employee's employment with the Company.

. . .

**Equitable Relief and Liquidated Damages**. I acknowledge and agree that the provisions set forth in this Agreement are necessary and reasonable to protect the interests of the Company, and that any breach or threatened breach of any provision of this Agreement by me, or at my direction, would cause great and irreparable harm to the Company, for which there would be no adequate remedy at law. Therefore, in addition to any other rights and remedies the Company may have, I agree that the Company, without the necessity of proving actual damages, shall be entitled to temporary and permanent injunctive relief to prevent me from breaching or continuing to breach this Agreement. I further agree that the Company shall be entitled to such relief without posting a bond or making any undertaking. Any such requirement of a bond or undertaking is hereby waived by me, and I acknowledge that in the absence of such a waiver, a bond or undertaking might otherwise be required by the Court. I further acknowledge and agree that damages may result if this Agreement is breached and that damages for such breach are difficult to ascertain, and accordingly, I agree to pay to the Company the sum of $100,000 for each such breach as liquidated damages in the event that I breach this Agreement. I also acknowledge and agree that the sum of $100,000 is not unreasonable under the circumstances existing at the time this Agreement is entered into.

. . .

**Governing Law and Forum**. This Agreement shall be construed in accordance with, and governed by, the laws of the State of California. If I have entered into a written arbitration agreement with the Company, the provisions of that arbitration agreement shall govern the resolution of any dispute between the Company and me arising out

of or relating to this Agreement, provided that such dispute involves any claim subject to arbitration under such arbitration agreement, except that, pursuant to California Code of Civil Procedure 1281.8, I understand that either party may apply to a California court for any provisional remedy, including a temporary restraining order or preliminary injunction. To the extent any legal action arising from or relating to this Agreement may be properly filed in state or federal court, I hereby consent to the personal jurisdiction of the state courts located in Orange County and the state and federal courts located in Orange County, California, and agree not to seek a transfer of venue from such jurisdiction. With respect to any legal proceeding or portion thereof that is properly adjudicated in state or federal court, the prevailing party shall recover all its costs incurred in prosecuting or defending such legal proceeding or portion thereof, including its reasonable attorneys' fees.

12. Calcote had intimate knowledge of Allied Universal's custom and cost-effective janitorial solutions.

13. Since 2018, Calcote was the face of Allied Universal business development in the northern Los Angeles region and was responsible for customer relationship management with existing customers, regular customer interface, development and execution of business strategy, and analyzing and delivering sales.

14. Calcote had substantial business development responsibilities at Allied Universal.

15. Calcote was intimately involved in the "pitch" or bidding processes for new customers in the northern Los Angeles region, which included working closely with operations to market Allied Universal's unique service offerings and tailor them to prospective customers in a cost-effective and competitive bid.

16. Allied Universal provided Calcote with leads developed by the company.

17. Because of his intimate work in sales and the bidding process, Calcote had access to Allied Universal's proprietary marketing plans and strategies, pricing

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4855-8639-0564, V. 1

platforms and fee structures, bid information, and confidential contact information for all of Allied Universal's prospective customers in the market.

18.     Each customer's preferences are unique and learning each customer's specific preferences takes a considerable investment of time and money.

19.     Calcote's responsibilities included ensuring that Allied Universal delivered on each of its customer's expectations.

20.     Fulfilling this responsibility required frequent discussions and reviews with each client about its janitorial needs and preferences to ensure that Allied Universal's services were in line with those needs and preferences.

21.     Calcote not only knew about Allied Universal's strategies and business development goals, but he also had knowledge about the operational specifications for each customer and customer preferences.

22.     Because he was responsible for maintaining the quality of existing customer relationships, in addition to driving sales with new customers, Calcote had access to Allied Universal's customers in California, including their pricing structures, cost structures, billing and payment practices, contact information, unique site requirements, and plans for future business or other development with those customers, including prospective cross-marketing opportunities for related Allied Universal service providers.

23.     Calcote had access to account profitability analyses and confidential information regarding which clients had the largest volume of janitorial employees, which invested most in janitorial equipment, which had the highest janitorial personnel turnover rates, which were trending in various directions, and which were most susceptible to leaving for a competitor and why.

24.     Allied Universal invested a tremendous amount of time and money in Calcote for him to effectively do his job. Calcote's salary was commensurate with the level of trust and responsibility required of his position with Allied Universal.

///

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4855-8639-0564, V. 1

**<u>Allied Universal's protection of Its Proprietary Information</u>.**

25.     Much of the value of the information comes from the fact that it is not known to Allied Universal competitors.

26.     For example, having information about its customers or customers unique business needs and preferences allows Allied Universal to tailor their sales approach that is superior to their competitors.

27.     That superiority would be diminished if Allied Universal competitors could similarly tailor their information using similar information.

28.     Knowledge of pricing and formulae would allow competitors to undercut Allied Universal on pricing.

29.     Because of the immense value and sensitivity of Allied Universal's operational protocols, business and strategy plans, and customer information, Allied Universal took concrete steps to protect the confidentiality of this proprietary information.

30.     Each computer issued to a company employee is password-protected and requires multiple log-ins in order to access the application and software programs.

31.     Allied Universal employees have varying levels of access to Allied Universal's software and application tools, which is based on whether they have a legitimate business need to access that level of information.

32.     Allied Universal has an employee handbook that has a provision that discuss confidentiality and the duties that employees, and former employees, must not disclose trade secrets.

33.     All Allied Universal employees who are given access to confidential information are required to sign confidentiality agreements similar to Calcote's Agreement.

///

///

4855-8639-0564, V. 1

### Calcote's Repeated Breach of Contractual, Common Law, and Statutory Obligations.

34.    In the days prior to Calcote's resignation from Allied Universal, Calcote emailed to his personal email account numerous files containing confidential and proprietary information maintained on his Allied Universal owned laptop and on Allied Universal's intranet and servers.

35.    Calcote accessed and surreptitiously took, among other things, Allied Universal's customer lists, customer financial information, customer bids, pricing information, and other proprietary sales-related information.

36.    At 2: 21 pm on March 19, 2022, Calcote forwarded to his personal email address a document entitled "Cleaning Area Square Footage," containing the building blueprint for one of Allied Universal's clients.

37.    At 2:51 pm on March 19, 2022, Calcote forwarded to his personal email address eight documents, all regarding the same client.

38.    The first such document was a "Cost sheet" for an Allied Universal client. This document consists of contract details, cost for services provided, the type of services, the name of the property contact, and the address for said contact individual.

39.    The email also included three copies of a document entitled "Client Additional Services Tag." These documents contain information regarding additional services the client sought to add to its existing contract.

40.    The email also included a copy of a "Contract," containing the 14-page contract with all the terms regarding pricing, services, dates for when the agreement ended, and renewal dates between Allied Universal and this client.

41.    The email also included a "rebid" document, containing detailed square footage for the client's buildings, monthly rates, annual rates, cost for services per square footage, number of service days per week, and production rates.
///

4855-8639-0564, V. 1

42.     The email also included another "rebid" document for the client, containing more detailed square footage for the client's buildings, monthly rates, annual rates, service cost per square footage, number of service days per week, and production rates for other facilities.

43.     The email also included another document entitled "New Proposal Boilerplate," containing a breakdown estimated costs for proposed additional work.

44.     At 7:31 pm on March 19, 2022, Calcote forwarded to his personal email address three documents entitled "rebid" for another one of Allied Universal's clients. These documents contained detailed square footage for that client's buildings, monthly rates, annual rates, service cost per square footage, number of service days per week, and production rates.

45.     At 7:41 pm on March 19, 2022, Calcote forwarded to his personal email address a document entitled "Emergency Contract" for another one of Allied Universal's customers. The document contained the 14-page contract between Allied Universal and that client, including all the terms regarding pricing and services to be provided.

46.     At 8:38 pm on March 19, 2022, Calcote forwarded to his personal email address a document entitled "[Client A] Maintenance Employee List," containing cost details for that customer, the services provided, and the main point of contact information for Client A.

47.     At 9:17 pm on March 19, 2022, Calcote forwarded to his personal email address an email with yet more attachments.

48.     The first attachment consisted of a document entitled "[Client A] Cost Sheet," containing contact information for Client A, details regarding its property, the type of services provided to Client A, and the cost for those services.

49.     The second attached document was entitled "[Client A] Bid Sheet". It contained detailed cost information for services to be provided and contact information for Client A's main point of contact.

50.     The third document was entitled "Target List" and contained details of potential new accounts including the name and contact information for the points of contact for those prospective clients and strategies on contacting these accounts for business development purposes.

51.     At 9:24 pm on March 19, 2022, Calcote forwarded to his personal email address a 48-page document entitled "RFP Janitorial Services" which contained a previous request for proposal for yet another Allied Universal account.

52.     At 9:41 pm on March 19, 2022, Calcote forwarded to his personal email address a document entitled "[Client A] Scope of Work," consisting of specific janitorial services and the details for the needs for this client.

53.     At 10:39 pm on March 19, 2022, Calcote forwarded to his personal email address a document entitled "Cost Sheet." The document consisted of cost details for the services provided to yet another account, the name of the individual who runs the account, and their contact information.

54.     At 11:07 pm on March 19, 2022, Calcote forwarded to his personal email address four documents all entitled "Account List," consisting of specific details of names, job site numbers, location of the account, and account manager information for additional Allied Universal clients.

55.     At 12:05 am on March 20, 2022, Calcote sent an email to his personal email address containing four documents.

56.     One document was entitled "Disinfecting Quote," consisting of a proposed bid with price quotes, services provided, scope of work provided, types of disinfecting chemical used and the type of bacteria and viruses the chemicals are bested equipped to manage.

57.     A second document was entitled "Cost Sheet." This document consists of contract details and contact information for yet another Allied Universal client.

58.     The third document was entitled "Cost Sheet" and contained the revised cost details for the services provided to the client, contract information with

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the name of the contact person, address for contact person, and building information.

59.     The fourth document was entitled "Coronavirus," and contained details regarding viruses and chemicals that are safe for disinfecting surfaces.

60.     At 12:07 am on March 20, 2022, Calcote sent to his personal email address a document entitled "Proposal." This document contained details regarding the pricing, scope of work, cleaning specifications, and proof of Allied Universal insurance Allied Universal had sent to yet another client.

61.     At 12:12 am on March 20, 2022, Calcote sent to his personal email address a document entitled "Bid Final Cost Sheet", consisting of details for the contract, costs for services provided, contract information for the account point of contact, and building specifications for an Allied Universal client.

62.     At 12:14 am on March 20, 2022, Calcote sent to his personal email address a second copy of the above document entitled "Bid Final Cost Sheet." This document contained final pricing for services provided, the account point of contract information, and building specifications for an Allied Universal client.

63.     At 12:39 am on March 20, 2022, Calcote sent to his personal email address another copy of the document entitled "Bid Final Cost Sheet." This document contained final pricing for services provided, the account point of contract information, and building specifications. He also sent a document entitled "Specification" consisting of cleaning details, the type of services provided, and the frequency of services.

64.     At 12:48 pm on March 20, 2022, Calcote sent to his personal email address a document entitled "bid," consisting of estimated job costs, daily hours for the account, hours per week for the account, hours per month for the account, and the account contact information.

65.     At 1:13 pm on March 20, 2022, Calcote sent to his personal email address a document entitled "Copy of Contract List," consisting of several hundred

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
4855-8639-0564, V. 1

names, emails addresses and phone numbers for the points of contact of various Allied Universal accounts.

66.    At 1:30 pm on March 20, 2022, Calcote forwarded to his private email address a document entitled "Specification Scope of Work," consisting of cleaning details, type of services provided, and the frequency of services provided for another Allied Universal client.

67.    At 1:41 pm on March 20, 2022, Calcote forwarded to himself a document entitled "COVID19 Grant Report CA State," consisting of the names of accounts, points of contact for the accounts and specific notes regarding each account.

68.    At 1:56 pm on March 20, 2022, Calcote sent to himself a document entitled "Job Cost Sheet" for yet another Allied Universal customer. This document contained details regarding the costs for services provided, contract information for the account, and building information.

69.    At 2:17 pm on March 20, 2022, Calcote sent to himself four "Estimated Job Cost" documents for another Allied Universal client. These documents contained detailed information regarding the estimated daily hours for the account, weekly hours for the account, monthly hours for the account, cost for services provided per month, and the types of services for each of the client's buildings.

70.    At 2:23 pm on March 20, 2022, Calcote sent to himself a document entitled "Copy of Bid" containing daily hours for an Allied Universal account, weekly hours for the account, monthly hours for the account, cost per month, and types of services for the account.

71.    At 2:27 pm on March 20, 2022, Calcote sent to himself two copies of a document entitled "Janitorial Scope of Work." The documents contained information regarding the types of cleaning services, type of services provided, and frequency of services for another Allied Universal.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

72.    At 2:31 pm on March 20, 2022, Calcote sent himself a document entitled "Night Recommendations." This document consisted of details regarding estimated job costs for another Allied Universal client.

73.    The 2:31 pm March 20 email also included a document entitled "Night" which contained detailed information relating to the estimated job costs for the same account.

74.    At 2:36 pm on March 20, 2022, Calcote sent to himself a document entitled "Client Master Account List." This document contained job names, addresses, job numbers, and client contact information for Allied Universal's clients.

75.    At 2:41 pm, on March 20, 2022, Calcote sent to himself a document entitled "Intro to Prospective." This document contained talking points regarding the nature of services provided by Allied Universal and marketing strategies for cold calling prospective clients.

76.    At 3:40 pm, on March 20, 2022, Calcote sent to himself a document entitled "Duster Letter." This document contained talking points regarding the nature of services provided by Allied Universal and marketing strategies for cold calling prospective clients.

77.    At 3:48 pm on March 20, 2022, Calcote sent to himself a document entitled "Consumable Pricing Lists," containing the costs of supplies procured by Allied Universal janitorial services.

78.    The 3:48 pm email on March 20 also included a document entitled "Job Cost Sheet," consisting of estimated daily hours for an Allied Universal account, weekly hours for the account, monthly hours for the account, cost per month, and types of services for each of the buildings covered by the account.

79.    The email also included a document entitled "Additional Services," consisting of additional services requested by the client.

///

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
4855-8639-0564, V. 1

80.     At 3:54 pm on March 20, 2022, Calcote sent to himself a document entitled "Joe Calcote Sales Goals." This document contained details regarding information for pending contracts, the names of the properties, the property point of contact information, the estimated revenue, and comments regarding marketing tactics.

81.     At 4:55 pm on March 20, 2022, Calcote sent to his personal email a document entitled "Request for Commission Approval." This document contained a list of accounts, job numbers, gross monthly profit, and gross profit margin for various Allied Universal accounts.

82.     At 5:21 pm on March 20, 2022, Calcote sent to his personal email a document entitled "Joe Calcote Commission Form." This document contained a list of accounts, job numbers, gross monthly profit, and gross profit margins for various Allied Universal accounts.

83.     At 5:26 pm on March 20, 2022, Calcote sent to his personal email another copy of the document entitled "Joe Calcote Commission Form." This document contained a list of accounts, job numbers, gross monthly profit, and gross profit margins for various Allied Universal accounts.

84.     At 5:29 pm on March 20, 2022, Calcote sent to his personal email a document entitled "Joe Calcote Commission Form." This document contained a list of accounts, job numbers, gross monthly profit, and gross profit margins for various Allied Universal accounts.

85.     At 5:42 pm on March 20, 2022, Calcote sent to his personal email a document entitled "Cost Sheet," containing estimated daily hours for an Allied Universal account, weekly hours for the account, monthly hours for the account, cost per month, types of services for each of the buildings associated with the account.

///

///

4855-8639-0564, V. 1

86.     At 5:42 pm on March 20, 2022, Calcote sent to his personal email a document entitled "Day Porter Specifications," consisting of janitorial needs and duties for a particular account.

87.     At 5:49 pm on March 20, 2022, Calcote sent to his personal email a document entitled "Allied Universal Janitorial Services Day Porter Scope of Work," consisting of consisting of job duties regarding services provided for a particular account.

88.     At 5:50 pm on March 20, 2022, Calcote forwarded to his personal email a document entitled "Allied Universal Branding Guidelines." This 61-page document contained detailed information regarding Allied Universal's brand strategies, brand platforms, marketing resources, and training material.

89.     At 1:53 am on March 21, 2022, Calcote sent to his personal email four documents.

90.     The first attached document was entitled "Estimated job cost" and contained information regarding the estimated daily hours for another account, weekly hours for the account, monthly hours for the account, cost per month for the account, types of services for the account.

91.     The second attached document was entitled "Job Cost Sheet," and contained the costs of services per month, costs per square feet, and contact information for the property manager of the account.

92.     The third document was entitled "Final Cost Sheet." This contained details regarding the daily hours for the same account, weekly hours, monthly hours for the account, cost per month for the account, profit, and overhead.

93.     The fourth document was a "Services agreement", consisting of an eleven-page agreement between Allied Universal and another client.

94.     At 3:44 pm on March 21, 2022, Calcote sent to his personal email a document entitled "Commission Report Form March," consisting of consisting of on account names, the monthly cost, square feet of the accounts, and job numbers.

95.     At 12:55 am on March 22, 2022, Calcote forwarded to his personal email a document entitled "Cancellation." This document contained the information for point of contact for the account, date of the cancellation, and the services Allied Universal had been providing to that client.

96.     At 1:00 am, on March 22, 2022, Calcote forwarded to his personal email another copy of the document entitled "Cancellation." This document contained the information for point of contact for the account, date of the cancellation, and the services Allied Universal had been provided.

97.     In total, Calcote sent himself 39 emails, attaching a total of 79 documents, containing information regarding most, if not all, of Allied Universal's clients in the Southern California region to his personal email account.

98.     Allied Universal continues to investigate the scope and amount of confidential and trade secret information Calcote removed without authorization for his personal use and enrichment.

99.     On March 21, Calcote voluntarily terminated his employment relationship with Allied Universal.

100.    Upon information and belief, Calcote has accepted employment with Joncowest, a competing janitorial service provider.

101.    Upon information and belief, Calcote has contacted Client A, a client which he had sent himself an extensive amount of confidential information, in order to solicit Client A to stop doing business with Allied Universal and hire Calcote's new employer.

102.    On May 26, 2022, Allied Universal's counsel sent Calcote a letter along with a copy of his Agreement with Allied Universal. The letter explained that his conduct to illegally obtain trade secrets constituted a clear violation of the Agreement as well as applicable law. The letter provided a time for Calcote to respond and explain his actions.

///

103.   Calcote ignored the letter and continues to be in possession of Allied Universal's confidential information and trade secrets.

104.   Any one of the above listed illicit incidents of Calcote sending Allied Universal confidential and trade secret information would be cause for substantial alarm. When viewed in light of him doing so just prior to accepting employment with Allied Universal's direct competitor, a clear picture emerges of a scheme to abscond with Allied Universal's proprietary information.

105.   This pattern of conduct and Calcote's continued possession of Allied Universal's confidential information evidence a clear, unlawful threat to Allied Universal's business. This knowledge of Allied Universal's confidential information outlined above provides Calcote with a tremendous – and unfair – competitive advantage. Further, it appears certain that Calcote intends to continue violating the law in order to unlawfully exploit Allied Universal's trade secrets for his own gain

## **FIRST CAUSE OF ACTION**

### **Violations of 18 U.S.C. § 1832 (Defend Trade Secrets Act of 2016**

106.   Allied Universal incorporates by reference Paragraphs 1 through 105 of the Complaint, as if fully set forth herein.

107.   The DTSA, which amended the Economic Espionage Act, 18 U.S.C. § 1832, to add a federal civil cause of action, among other things, defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures, or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

108.   During the course of his employment with Allied Universal, Calcote was provided access to substantial amounts of Allied Universal's trade secrets.

109.   Such trade secrets are developed and maintained by Allied Universal at great time, cost, and expense to Allied Universal, and are maintained on password protected networks accessible only by certain high-ranking Allied Universal employees with a need to use such information on the Company's behalf.

110.   Allied Universal instructs these employees to keep trade secret and proprietary Company information confidential.

111.   All employees who have access to this information, are required to sign confidentiality agreements.

112.   Allied Universal's trade secrets are not available to the general public and are closely guarded by Allied Universal.

113.   Allied Universal keeps such information strictly confidential in order to maintain a competitive advantage.

114.   The Allied Universal trade secrets entrusted to Calcote consists of, among other things, documents relating to the resources by which Allied Universal develops proposed bids for clients, strategies on how to obtain future clients, information on how to craft the best bid for prospect and renewing clients, and confidential information about accounts Allied Universal is seeking to obtain.

115.   By accessing Allied Universal's confidential information and trade secrets stored on his Allied Universal laptop and on the Company's intranet and sending these items to his personal email shortly before leaving to work for a competitor, Calcote acquired Allied Universal's trade secrets by improper means and without authorization.

116.   Upon information and belief, Calcote has used or disclosed and/or intends to use or disclose, Allied Universal's trade secrets on behalf of a competitive company.

117.   Calcote knew or should have known that the information, as described, (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by

Allied Universal at great expense and effort; (4) was maintained as confidential and is not generally available to the public and Allied Universal's competitors; (5) would provide significant benefit to a company seeking to compete with Allied Universal; and (6) is critical to Allied Universal's ability to conduct its business successfully.

118.   The information that Calcote has misappropriated describes and relates to Allied Universal, which involves services that are utilized throughout interstate commerce.

119.   Calcote has been, and continues to be, unjustly enriched by the misappropriation and/or threatened misappropriation of Allied Universal's trade secrets and confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, and/or otherwise misappropriate Allied Universal's trade secrets and confidential information.

120.   As a result of the threatened and/or actual misappropriation of Allied Universal's trade secrets and confidential information, Allied Universal has suffered, and will continue to suffer, loss of business expectancies, customers, employees, trade secrets, and goodwill in amounts which may be impossible to determine, unless Calcote is enjoined and restrained by order of the Court.

121.   In addition, Allied Universal seeks actual, incidental, compensatory, punitive, and consequential damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

122.   Because Calcote's misconduct is ongoing and poses a threat of significant irreparable harm that cannot be compensated by money alone, Allied Universal requests that this Court grant injunctive relief against Calcote from actual or threatened disclosure or utilization of Allied Universal's trade secrets, in addition to granting Allied Universal its attorneys' fees and exemplary damages.

///

///

4855-8639-0564, V. 1

## SECOND CAUSE OF ACTION

### Breach of Contract

123.   Allied Universal re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-122 above, as though set forth fully herein.

124.   Calcote entered into the Agreement whereby Calcote owed contractual duties to Allied Universal as set forth more fully above and in Exhibit A.

125.   The Agreement is a valid, enforceable, and binding contract.

126.   Allied Universal performed all of its obligations under the Agreement.

127.   Calcote breached the Agreement through his conduct of taking confidential and trade secret information from Allied Universal without authorization on multiple occasion and refusing to return the confidential information.

128.   Calcote has further breached the Agreement by attempting to use the information for his own gain and enrichment, including but not limited to soliciting Client A.

129.   Calcote has additionally breached the Agreement by failing to return Allied Universal's property, including confidential and trade secret information, promptly upon his resignation from his employment with Allied Universal.

130.   As a direct and proximate result of this conduct, Allied Universal has suffered and, if the conduct is not stopped, will continue to suffer damages as well as irreparable injury and loss. In addition, Allied Universal is entitled to further equitable relief as set forth in the Agreement.

131.   Allied Universal has been damaged in a sum which is presently unascertainable.

132.   Damages are continuing to accrue, and Allied Universal will present evidence of the exact amount and nature of these damages at the time of trial.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### THIRD CAUSE OF ACTION

**Misappropriation of Trade Secrets in Violation of the Uniform Trade Secrets Act, California Civil Code §3426 et seq.**

133.   Allied Universal re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-132 above, as though set forth fully herein.

134.   Allied Universal was in possession of certain trade secrets that are protected under the California Uniform Trade Secrets Act, California Civil Code § 3426 et seq. These trade secrets include confidential and proprietary information regarding, but not limited to, names and addresses and customer preferences requirements of persons/entities who buy products and services from or through Allied Universal, as well as Allied Universal's costs and pricing structures; bidding strategies and processes; contract information; and other confidential and proprietary information regarding Allied Universal's strategy for competing against other companies in its field.

135.   The above-described trade secrets are of substantial value to Allied Universal. They are of independent economic value because they are based on information not generally known within the trade or by other persons or entities who could obtain economic value from their use or disclosure, and because are the product of many years of practice, development, and improvement (through a considerable effort of time and expense), which allow Allied Universal to provide quality service at competitive prices.

136.   Allied Universal made reasonable efforts to ensure that the above-described trade secrets remained secret and protect them from disclosure to its competitors or potential competitors, including by entering into the Agreement with Calcote, which require that Allied Universal's trade secrets be kept in the strictest confidence. Calcote knew and understood that Allied Universal sought to protect the confidentiality of its trade secret information.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
4855-8639-0564, V. 1

137.  Allied Universal entrusted Calcote, while he was employed with Allied Universal, with the above-described trade secrets so he could perform his job effectively for Allied Universal's benefit.

138.  Calcote misappropriated the above-described trade secrets by obtaining, using, or improperly disclosing information provided to Calcote by Allied Universal's in confidence for the purpose of attaining an unfair competitive advantage and causing injury to Allied Universal. As set forth above, among other things, this included Calcote's misappropriation of bidding, pricing, service, and cross-marketing trade secrets regarding Allied Universal's current and potential customers.

139.  Calcote has used and, unless restrained by this Court, will continue to use these trade secrets to compete unfairly with Allied Universal.

140.  As a direct and proximate result of this conduct, Allied Universal has suffered and, if the conduct is not stopped, will continue to suffer substantial damages as well as irreparable injury and loss. Allied Universal is entitled to lost profits suffered as a result of Allied Universal's conduct in an amount to be determined at trial and for the costs and fees incurred in prosecuting this action.

141.  Allied Universal has been damaged in a sum which is presently unascertainable.

142.  Damages are continuing to accrue. Allied Universal seeks leave of court to present evidence of the exact amount and nature of these damages at the time of trial.

143.  Calcote performed the foregoing acts, conduct, and omissions (and will continue to do so) intentionally, maliciously, and oppressively, with the intent and design to damage Calcote's business and improve the business himself and other entities, thereby warranting an award of exemplary damages, as provided by Civil Code §3426.3(c) and an award of reasonable attorneys' fees as provided by Civil Code §3426.4.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
4855-8639-0564, V. 1

## FOURTH CAUSE OF ACTION

### Breach of the Duty of Loyalty

144.   Allied Universal incorporates by reference Paragraphs 1 through 143 of the Complaint, as if fully set forth herein.

145.   As a Business Development Manager, Calcote was placed in a high-level position of confidence and trust at Allied Universal and was expected to devote his full time to the development and promotion of Allied Universal's business interests.

146.   As a result of this special relationship, Calcote owed, among other things, a duty to not use his position improperly to profit personally or to assist others in profiting at Allied Universal's expense. He was further expected to avoid situations that might influence his actions or prejudice his judgment in handling Allied Universal business.

147.   However, during the course of his employment with Allied Universal, Calcote breached his duty of loyalty by, among other things, sending current client pricing lists and existing client lists to his personal email address and downloading large amount of confidential and proprietary information from his Allied Universal's laptop and emailing the confidential documents and trade secrets to his private email address 4ucoty@gmail.com, while still employed by and receiving a paycheck from Allied Universal.

148.   As a direct and proximate result of Calcote's breach of the duty of loyalty owed to Allied Universal, Allied Universal has suffered, and will continue to suffer, financial loss and other damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Conversion

149.   Allied Universal incorporates by reference Paragraphs 1 through 148 of the Complaint, as if fully set forth herein.

///

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4855-8639-0564, V. 1

150.   Allied Universal have a legal right of possession to the files contained on its internal computer network or the Allied Universal laptop computer utilized by Calcote, including the files discussed above that Calcote accessed by sending to his private email address ("Converted Files").

151.   Calcote had no legal claim to the Converted Files that Calcote took from his Allied Universal laptop and emailed to his private email.

152.   Allied Universal has made a demand for the return of the Converted Files, but Calcote has failed to provide them.

153.   Calcote acted willfully and maliciously in an effort to abscond with Allied Universal' confidential and property information and trade secrets.

## SIXTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

154.   Allied Universal re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-153 above, as though set forth fully herein.

155.   Allied Universal has economic relationships with its customers that result in economic benefit to Allied Universal.

156.   Calcote knew of Allied Universal's economic relationship with its customers.

157.   Allied Universal is informed and believes that Calcote is wrongfully, unlawfully, and intentionally engaging in conduct that is intended to disrupt Allied Universal's economic relationships with its customers, or that Calcote knew was certain or substantially certain to disrupt such economic relationships.

158.   In particular, and on information and belief, Allied Universal alleges that Calcote has engaged in multiple instances of independent torts against Allied Universal in furtherance of his efforts to interfere with such economic relationships with Allied Universal's customers as alleged herein. Such wrongful conduct includes but is not limited to: 1) Calcote's breach of his contractual obligations to

4855-8639-0564, V. 1

Allied Universal; 2) the misappropriation of trade secret and confidential information by Calcote, 3) Calcote's use or attempted use of that information subsequent to his employment with Allied Universal, and 4) breaches by Calcote of his duty of loyalty to Allied Universal while employed with Allied Universal and while using Allied Universal's resources.

159.   Calcote's conduct was and continues to be a substantial factor in disrupting Allied Universal's economic relationship with its customers.

160.   As a direct and proximate result of this conduct, Allied Universal has suffered and, if the conduct is not stopped, will continue to suffer substantial damages as well as irreparable injury and loss. Allied Universal is entitled to lost profits suffered as a result of Allied Universal's conduct in an amount to be determined at trial and for the costs and fees incurred in prosecuting this action. In addition, Allied Universal is entitled to further equitable relief as set forth in the Agreement.

161.   Allied Universal has been damaged in a sum which is presently unascertainable.

162.   Damages are continuing to accrue. Allied Universal seeks leave of court to present evidence of the exact amount and nature of these damages at the time of trial.

163.   Calcote performed the foregoing acts, conduct, and omissions (and will continue to do so) intentionally, maliciously, and oppressively, with the intent and design to damage Allied Universal. By reason of this conduct, Allied Universal is entitled to recover punitive and exemplary damages in an amount to be determined at trial.

///

///

///

///

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4855-8639-0564, V. 1

## SEVENTH CAUSE OF ACTION

### Violation of California Business & Professions Code Section 17200

164.   Allied Universal re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-163 above, as though set forth fully herein.

165.   Calcote breached his duty of loyalty to Allied Universal, and Calcote intentionally and negligently interfered with Allied Universal's business relationships with its customers, by using Allied Universal confidential, trade secret and proprietary information for his own purpose and on behalf of himself and to the detriment of Allied Universal, as alleged above. These acts, among others alleged herein constituted unlawful and unfair business practices within the meaning of California Business and Professions Code § 17200 et seq.

166.   Calcote has profited and will continue to profit as a direct and proximate result of his wrongful conduct.

167.   As a direct and proximate result of this conduct, Allied Universal has suffered and, if the conduct is not stopped, will continue to suffer substantial damages as well as irreparable injury and loss.

168.   Allied Universal is entitled to lost profits suffered as a result of Calcote's conduct in an amount to be determined at trial and for the costs and fees incurred in prosecuting this action. In addition, Calcote is entitled to further equitable relief as set forth in the Agreement.

169.   Allied Universal has been damaged in a sum which is presently unascertainable.

170.   Calcote performed the foregoing acts, conduct, and omissions (and will continue to do so) intentionally, maliciously, and oppressively, with the intent and design to damage Allied Universal. By reason of this conduct, Allied Universal is entitled to recover punitive and exemplary damages in an amount to be determined at trial.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4855-8639-0564, V. 1

## **PRAYER FOR RELIEF**

WHEREFORE, Allied Universal respectfully request judgment in their favor and against Calcote as follows:

(a)     Issuing a preliminary and permanent injunction preventing Calcote from continuing his unlawful acts as set forth herein;

(b)     Awarding actual damages resulting from Calcote's wrongful conduct alleged herein, in an amount to be proven at trial;

(c)     Awarding liquidated damages in the amount of $100,000 per breach of the Agreement resulting from Calcote's wrongful conduct alleged herein;

(d)     Awarding punitive damages for Calcote's malicious, willful, wanton, intentional, and legally unjustified misconduct;

(e)     Awarding Allied Universal its attorneys' fees, costs, and other expenses incurred in this action; and

(f)     Granting Allied Universal such other and further relief as this Court deems just and proper.


DATE: June 7, 2022                MARTENSON, HASBROUCK & SIMON, LLP


By:    _/s/ Matthew T. Sinnott_____
Matthew T. Sinnott
David L. Lewis
Attorney for Plaintiff
UNIVERSAL BUILDING MAINTENANCE, LLC dba ALLIED UNIVERSAL JANITORIAL SERVICES

.